FLORIDA EAST COAST RY. CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al. Interveners).

(Commerce Court.   November 13, 1912.)

No. 58.

1. COMMERCE (§ 95*)—FEDERAL COURTS—JURISDICTION OF COMMERCE COURT.

The Commerce Court is not authorized to review the determination of disputed questions of fact by the Interstate Commerce Commission, made after a full and fair hearing, on proper notice, unless the Commission exercised its power in an arbitrary and unreasonable manner, or in violation of petitioner's constitutional rights, and it cannot be said to have acted arbitrarily in making a finding that an existing rate is unreasonable, where it is based on substantial, though conflicting, evidence.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 145; Dec. Dig. § 95.*

Jurisdiction of federal courts of suits under Interstate Commerce Act, see note to Bailey v. Mosher. 11 C. C. A. 318.]

2. COMMERCE (§ 95*)—INTERSTATE COMMERCE COMMISSION—REGULATION OF RATES.

A finding by the Interstate Commerce Commission that rates established by the Florida East Coast Railway Company from points of origin to Jacksonville on pineapples, citrons, fruits, and vegetables destined for points beyond in other states, were unjust and unreasonable, *held* supported by substantial evidence, and to justify an order revising such rates, and establishing distance rates on carload and less than carload shipments.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 145; Dec. Dig. § 95.*]

3. CARRIERS (§ 26*)—INTERSTATE COMMERCE—RATES ESTABLISHED BY INTERSTATE COMMERCE COMMISSION.

The oversea extension of the Florida East Coast Railway from Homestead to Key West, in view of its unique character, its great cost, and the fact that local business to any considerable amount cannot be expected thereon, cannot properly be considered a part of the main line, for the purpose of determining whether or not rates established by the Interstate Commerce Commission from points on the main line north of Homestead are confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*

Regulations of charges by carrier for long and short hauls, see note to Interstate Commerce Commission v. Southern Ry. Co., 60 C. C. A. 542.]

Petition by the Florida East Coast Railway Company against the United States, in which the Interstate Commerce Commission, the Railroad Commissioners of Florida, the Florida Fruit & Vegetable Shippers Protective Association, and others intervene.   On motion to

strike out evidence, and on final hearing. Motion overruled, and petition dismissed.

For opinion of Interstate Commerce Commission, see 22 Interst. Com. Com'n R. 11.

Alexander St. Clair-Abrams, of Jacksonville, Fla., and Fred C. Bryan, of Washington, D. C., for petitioner.

Winfred T. Denison, Asst. Atty. Gen., Blackburn Esterline, Sp. Asst. Atty. Gen., and Thurlow M. Gordon, Sp. Asst. Atty. Gen., all of Washington, D. C., for the United States.

Charles W. Needham, of Washington, D. C., for Interstate Commerce Commission.

F. M. Hudson, of Tallahassee, Fla., for Railroad Commissioners of Florida.

A. A. Boggs, of Miami, Fla., for intervening shippers.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Associate Judges.

MACK, Judge. This suit was brought to set aside an order of the Interstate Commerce Commission, entered November 6, 1911, in two cases heard and considered together, Commission's Nos. 1,168 and 3,808, in so far as the Florida East Coast Railway Company is thereby affected. The other railroad companies have complied with the order of the Commission.

The original complaint in case No. 1,168, filed in 1907, involved the rates upon fruits and vegetables from producing points in Florida to consuming markets in all parts of the United States east of the Rocky Mountains. Those rates were considered at the first hearing under two divisions, viz.: (1) A gathering charge from the points of origin in Florida to what were known as Florida base points, of which Jacksonville was the principal one, when destined to interstate points; and (2) rates from such base points to points of final destination in other states. The sum of the two rates constituted the through charge.

On June 25, 1908 (14 Interst. Com. Com'n R. 476), the Commission held that at that time the rates on citrus fruits and pineapples from the base points to certain points of destination named in the order were unreasonable, and fixed reasonable rates, establishing carload and less than carload all-rail rates to Eastern points, to which theretofore only any-quantity rates had prevailed, reducing the rates for carload shipments much below the any-quantity rates, and making the less than carload rates 10 cents per crate higher than the carload, with the proviso that they should not, however, exceed to any point the then any-quantity rate to such point. The Commission declined to order in carload and less than carload rates on vegetables to these points, although it suggested to the railroads that they consider the advisability of doing so.

It refused to condemn as unreasonable the any-quantity gathering rates from points of production to the base points. In justification of this refusal the Commission said:

"From an examination of the elaborate figures which were introduced upon the trial, showing the character of the traffic handled by these Florida

roads, the conditions under which it is handled, their earnings, and the cost of operation, running through a series, of years, it is difficult to see how these railroads can be expected to transport in a suitable way this fruit and vegetable traffic from points of production to these basing points for a less sum than they now receive. It is difficult to see how, even upon the present tariff, those lines can in the immediate future expect to pay any considerable return upon their investment. We feel that these local rates, although they are high in comparison with other local rates, are as low as should be established under all the circumstances."

The carriers complied with the order of the Commission, in so far as definite rates were fixed, but did not accept the suggestions which were made in the report.

Subsequently a complaint was filed with the Commission to obtain the benefit of the suggestions of the Commission in the former case, and to secure the establishment of rates on fruits and vegetables from Florida base points to those portions of the United States not embraced in the previous order. As No. 1,168 had been retained for further proceedings, and as shippers on the Florida East Coast Line complained of the rates on pineapples, citrus fruits, and vegetables, this case was again set down for hearing with No. 2,566, and it was stated by the Commission that the previous record in No. 1,168 should be treated as a part of the record in No. 2,566.

The order in No. 2,566 affected and changed the rates on citrus fruits, pineapples, and vegetables, including carload and less than carload rates, from Jacksonville, Fla., and other Florida base points, to points particularly named in other states.

The order against the Florida East Coast Railway, in No. 1,168, entered February 8, 1910 (17 Interst. Com. Com'n R. 552), found the existing any-quantity rates on pineapples unreasonable from points on the Florida East Coast Railway to Jacksonville, Fla., when applied to interstate traffic, and fixed certain maximum rates for the transportation of pineapples in carload and less than carload quantities. In support of this order the Commission said in its report:

"The growers of pineapples suggest that we might properly establish a lower rate on pineapples than upon oranges. All the incidents of the transportation are the same. The value of the two commodities is practically the same. The only reason put forward for a lower rate upon pineapples is that the condition of the industry demands it; but testimony already taken in this case shows that in the past the condition of the orange industry in Florida has been and now is critical, and if we were to adopt the theory urged upon us by the growers of pineapples it is almost certain that we should be met by the same argument with equal force in case of other citrus fruits and vegetables in Florida and elsewhere. We repeat that the freight rate cannot be established upon that basis. * * * The evidence produced upon the present hearing suggests no change in what was said (in the former report) so far as that applies to the Florida East Coast Railway. * * * While, however, we adhere to what was said in the previous case we do think upon more careful examination that these rates of the Florida East Coast Railway on pineapples ought to be somewhat revised. They are not consistent with one another and in our opinion those from the more distant points are too high as compared with rates from nearby points. The present rates are in any quantity. About 60 per cent. of these pineapples move from the point of origin in carloads and 40 per cent. in less than carloads. Carload shipments are stripped and loaded by the shipper and are not unloaded at Jacksonville which probably saves the carrier not far from 2 cents per

box. The less than carload shipment is loaded by the railway and usually unloaded at the station in South Jacksonville or Jacksonville. In our opinion carload rates should be established which are less than the present any-quantity rates by 3 cents per box. The establishment of such carload rates will not of a certainty work a decrease in the net earnings of the carriers. It is a false theory of transportation which seeks to force the shipper to avail himself of a less than carload service which is more expensive to render for the purpose of increasing the gross revenues of the carrier. The true object should be to perform the service in the most economical manner and to charge for that service reasonable compensation. In the end this makes to the advantage of both the carrier and its patron. The vice president of the Florida East Coast Railway stated that he had always thought that carload rates should be established and that in his opinion to establish carload rates 3 cents per box less than the present any-quantity rates would not prejudice the net revenues of his company since he would make up by saving in operating expenses what he lost in gross income."

The orders of February 8, 1910, were complied with. Thereafter, and effective July 15, 1910, the Florida East Coast Railway Company voluntarily established in place of its any-quantity rates carload and less than carload rates on citrus fruits and vegetables from points of production to Jacksonville. The carload rates were, from most points, less than the former any-quantity rates; the less than carload rates were higher than the former any-quantity rates from points 230 miles or less south of Jacksonville, and lower from points farther south; but both the carload and less than carload rates so established were considerably higher than the pineapple rates established under the order of February 8, 1910. While the new rates were approved by the Railroad Commission of Florida for intrastate traffic, they were considered by it to be too high as proportional rates on interstate traffic. Pursuant, therefore, to a Florida statute, the State Commission, having on January 28, 1911, complained in case No. 3,808 against the other railroads, intervened in case No. 1,168.

At the hearing on these complaints each party complainant and defendant in cases Nos. 1,168 and 3,808 was present, testimony was taken, and on November 6, 1911, the order now complained of was made. 22 Interst. Com. Com'n R. 11. This order deals exclusively with the rates on pineapples, citrus fruits, and vegetables from points on the railroads within the state of Florida to Jacksonville, Fla., when destined for points beyond in other states. It finds the existing rates unjust and unreasonable to the extent that they exceed the maximum rates prescribed by the Commission in its order, and prescribes distance rates upon carload and less than carload quantities of pineapples, citrus fruits, and vegetables, together with a minimum carload to be applied to each kind of traffic named, the rates so fixed to be maintained for a period of not less than two years from January 2, 1912.

By this order a slight increase was made in the pineapple rate from some points more than 320 miles south of Jacksonville, the rates per crate for citrus fruits, in both carload and less than carload lots, were reduced to the pineapple rates, and the rate for vegetables, which in crates weigh 62½ per cent. of citrus fruits, was fixed at 70 per cent. of the citrus fruit rate. In the report on which this order was based the Commission says:

"The original case was heard in the spring of 1908, and was disposed of upon the basis of conditions then existing. This Commission states in its

report that the rates in force had been approved by the Florida Commission, and that circumstance may have somewhat influenced us in our approval of the gathering schedules at that time. * * * We concluded that, while these gathering rates were higher than would perhaps be reasonable upon railroads where the volume of business was greater and the net financial result more favorable, still they could not be deemed excessive in view of the circumstances under which the service was rendered. This conclusion was reached less than three years ago. No material change has taken place since then, so far as this record discloses, which would lead to a different conclusion if the same subject were before us to-day. * * * There is nothing in this record which would call for a reconsideration of our former conclusion, if exactly the same question were now before us. There is, however, a material difference in one respect between now and then. When we decided the original case, rates up to the gathering point were in all cases any-quantity, and in most instances this was also true from the base point to destination. * * * There are * * * in effect to-day by the order of this Commission carload rates upon both fruits and vegetables from base points. * * * Since then that company (the Florida East Coast Railway Company) has filed carload and less than carload rates upon citrus fruits and vegetables, but these rates are higher than those named by us for pineapples. It appeared in the original case that citrus fruits to some extent, and vegetables to a much greater extent, were shipped in small lots to Jacksonville and there reloaded for movement beyond. It was our impression, in establishing carload rates from the base point, that this would permit the movement in small lots up to the base point and the consolidation at such point, and that the carload movement would in fact be mainly beyond the base point. Such has not been the result. In order to obtain the carload rate beyond the base point, it seems to be necessary for the shipper, in actual practice, to present a full carload at the point of origin, and from this it follows that the movement up to the base point at the present time is entirely different from what it was when we approved these any-quantity rates. At that time the loading was by the carrier; now it is mainly by the shipper. The loading of the cars from the point of origin to the base points is much heavier now than formerly. * * * The number of cars now required to transport the same amount of this traffic from points of origin to base points would be materially less than in 1908. Otherwise stated, it costs the shipper more to handle his business to-day and it costs the railroad less. * * * It is earnestly contended in behalf of the Florida East Coast Railway Company that to apply these rates to that line would be confiscatory, and considerable testimony has been introduced and much discussion had upon both sides touching the financial condition of that company. * * * The financial condition of the Florida East Coast Railway has been referred to at considerable length in our previous opinions in No. 1,168, and it would not be profitable to discuss that subject further here. Taking that into account, together with all the other facts and circumstances bearing upon the matter, we are of the opinion that the rates suggested for the Seaboard Air Line and the Atlantic Coast Line in the state of Florida would be just and reasonable to apply upon the railroad of the Florida East Coast Railway Company. Those rates are already in effect upon pineapples, and do not involve any extraordinary reductions from the rates on vegetables and citrus fruits which that company has voluntarily established."

Petitioner seeks to set aside the order of the Commission on the following grounds: First. That there was no evidence to support the conclusion that the rates voluntarily made by the company were unreasonable and therefore the Commission had no power to proceed further and to fix what it might deem reasonable rates. Second. That the rates are confiscatory.

[1] First. It cannot be denied that the Commission, both at the last hearing and at the earlier hearing in the same case, had a great

mass of evidence before it touching the many questions of cost and value of the properties, cost and value of the services rendered, the history of the road and of the development of the industries involved, the methods of transportation, and numerous other matters relevant to the determination of the unreasonableness of existing rates and the fixing of reasonable rates for the future. It is unnecessary to detail the testimony. Clearly there can be found therein substantial support for the conclusions reached, even though the Commission, if it had given weight to other parts thereof, might have reached a different conclusion. This court, however, is not authorized to review the Commission's determination of disputed questions of fact, made after a full and fair hearing, on proper notice, unless its power has been exercised in an arbitrary or unreasonable manner, or in violation of petitioner's constitutional rights.

If the opinion of the Commission that present rates are unreasonable is based upon substantial, though conflicting, evidence, the power cannot be said to have been exercised in an unreasonable manner, even in a case wherein this court, if it had been charged with the duty of making the finding from the whole evidence, would have held the rates reasonable.

[2] It is, however, urged that the report shows conclusively, in the passages above cited, that the Commission could not have deemed and did not deem the former rates unreasonable, because it expressly states that, if the "same subject" or "exactly the same question" that was considered in the original proceeding were then before it, it would again refuse to hold the rates unreasonable, and it is urged that the "same subject" and "exactly the same question" were again before the Commission, viz., the reasonableness of the rates from the producing points to the base points.

To adopt this argument would be to give a much too literal interpretation to the quoted phrases, and would require us to disregard the entire context. A consideration of the whole report clearly shows that the Commission intended thereby to state that, if the situation and conditions in 1911 were the same as in 1908, it would adhere to its former views. It thereupon proceeds, however, to indicate that the situation as to citrus fruits and vegetables had changed since 1908, exactly as it had indicated in 1910 the change in the pineapple situation since 1908, thereby demonstrating that the question before it was not "exactly the same," but materially different from that submitted to it in 1908. The orders of 1908 and 1910, establishing carload and less than carload rates from base points in place of any-quantity rates, changed the transportation methods, not only from, but to, the base points; and, as the Commission points out, they caused a great increase in the carload movement to base points, involving large savings to the railroad and increased expense to the shippers in the handling of the goods. Moreover, on full consideration, the any-quantity pineapple rates had been found to be unreasonably high when applied to the transportation after carload and less than carload rates were established, and from the evidence then taken, together with that taken on the last hearing, the Commission found, as it well might, that there

was no substantial difference in the transportation conditions between pineapples and citrus fruits. While the voluntary act of the railroad in reducing its rates in July, 1910, would not of itself justify the Commission in reducing them still further, and especially in making the less than carload rates lower than the former any-quantity rates, it was in effect an admission that the old any-quantity rates in force since 1902 would be unreasonable. Moreover, inasmuch as these new rates were put in after January 1, 1910, the burden was on the carrier under section 15 of the act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]) as amended June 18, 1910 (36 Stat. 556, c. 309 [U. S. Comp. St. Supp. 1911, p. 1332]), to establish their reasonableness in so far as they exceeded the former rates.

If the change from any-quantity rates to carload and less than carload rates involved nothing more than a division of the existing business into two kinds, merely for bookkeeping purposes, a reduction not only of the carload, but also of the less than carload, rates might well be termed an arbitrary act. But, as the Commission points out, it involves much more than this. The effect of establishing carload rates is ordinarily greatly to increase the carload business, both absolutely and relatively to the less than carload, to bring about heavier loading, to lighten the handling operations of the railroad, and thereby to reduce the operating expenses. The net revenues might remain the same so far as the mere effect of this change is concerned, for the reasons stated in the testimony of petitioner's vice president, as quoted above from the Commission's report on the pineapple rate. But even if the net revenues would be decreased about 10 per cent., as petitioner contends, the Commissioner's action could not therefore be said to be unreasonable or arbitrary. And in this case it is to be noted that the railroad itself in its voluntary change had made many less than carload rates lower than the former any-quantity rates.

Considering the new rates, not in their effect on the general revenues of the company, but in relation to the cost of the service to the carrier, exclusive of return on investment, the evidence is clear that they are not only greatly in excess of any out of pocket expense for this service, but that they give the carrier a considerable margin over the proportionate operating expense, as their contribution toward the return on the investment. In view of all the foregoing considerations, the Commission cannot be charged with having exercised in an arbitrary or unreasonable manner its power of determining the reasonable rate, even if such a charge, presented in petitioner's argument and briefs, can fairly be said to have been made in the petition in this case.

[3] Second. The basis for the contention that the order is confiscatory is the claim that the entire property has a present value in excess of the bonded indebtedness of $31,000,000 and the capital stock of $5,000,000; that the net revenues for the year ending June 30. 1911, were less than 4 per cent. of this value; and that if the line, not from Homestead, but from Miami, north, be considered as the main line, the entire net revenues therefrom, after deducting that part thereof derived from passenger and freight traffic originating at or destined to points south of Miami, would yield but little over 4 per

cent. of its present value, whereas the legal rate of interest in Florida is 8 per cent.

This claim is based on two assumptions: (a) That the main line ends at Miami, and not at Homestead; (b) that the value of the company's entire property, including the so-called oversea extension, and not merely of the main line. itself, must be considered in determining whether rates from points on the main line are confiscatory.

Without at this time considering under what circumstances, if any, the reduction of particular rates can be held to violate the constitutional rights of a carrier, because thereby the total revenues become inadequate, even though the particular reduced rates yield some contribution to the general net revenues over and above the pro rata cost of service, we are of the opinion that in the present case there can be no basis for a charge of confiscation, because neither of the assumptions above stated and upon which it is based is sound.

(a) Originally the road ended at Miami; later on, however, and before the act of 1905 in reference to the oversea extension hereinafter referred to was adopted, it was extended to Homestead. In its plant or construction account, the company itself, in its own bookkeeping, deals with the line from Miami to Homestead as part of the main line, and not of the oversea extension. The increased production in the territory between Miami and Homestead since 1908 demonstrates the wisdom of the construction of this branch as part of the main line, independently of the oversea extension. We are clearly of the opinion that the main line must be considered as ending at Homestead. Without discussing the evidence in detail, we are further of the opinion that the net revenues on this main line are in excess of 8 per cent. on the present fair value of the property, and not merely something over 6 per cent., as conceded by the petitioner.

No possible question of confiscation can arise under these circumstances, even if the effect of the order will be to reduce the gross, or even the net, revenues of the company for the next two years by the full amount of the difference in rates, amounting, as applied to the tonnage for the year ending June 30, 1911, to $131,000, and being about 3 per cent. of the gross, and 10 per cent. of the net, operating revenue of the main line.

(b) Whatever the powers of the company may be under its amended charter, it was not until after the Legislature of Florida passed an act in May, 1905 (Laws 1905, c. 5595), entitled "An act to encourage and secure the construction of a line of railway from the mainland of Florida to Key West, to provide for a fair and equitable assessment of taxes of the corporation constructing it, and to grant right of way over the submerged and other lands belonging to the state, and over the waters of the state, and to authorize the filling of the submerged lands and to construct buildings, docks, and depots thereon," that the company, at a stockholders' meeting, decided to construct the oversea extension.

The tremendous cost of the line from Homestead to Key West, over $175,000 a mile, the scarcity of population along the route, the natural impossibility of ever making much of the territory productive, either

agriculturally or industrially, confirm the recital in the act of 1905 that the purpose of the extension was to share in the traffic expected to pass through the Panama Canal, unless, indeed, as was argued to us, this marvel of engineering skill was constructed as a monument to the man, who from the early days to the present was and is the sole owner of the petitioner's stock, and to whose indomitable energy and supreme confidence in the future prospects of this section of the country the road primarily owes its construction. At the present time the operating expenses of this extension are naturally in excess of its revenues. Its entire gross revenues—freight and passenger—for the year ending June 30, 1911, were less than $100,000. The contention that the earnings of the main line on passengers who traveled over the extension is to be attributed to the extension cannot be sustained. There is no evidence that would justify this court in holding that the extension produced any considerable increase of travel on the main line, or that most of the passengers to Cuba via Key West would not have gone to or via Miami or Homestead, if the extension had not been built.

To what extent shippers on an original or main line should bear increased burdens due to the construction of additional or branch lines must depend upon the particular circumstances of each case. No general rule can be formulated. In our opinion, the Commission was fully justified in disregarding the value of this extension, and this court, in determining whether or not the order of the Commission operates to confiscate petitioner's property, must likewise at this time and at this stage in the development of the business on the extension and on the main line reach its conclusions, irrespective of the value of the oversea extension.

At the final hearing a motion was made on behalf of the United States to strike out all evidence which did not form a part of the proceedings and testimony before the Interstate Commerce Commission. In view, however, of the conclusions reached by us after a consideration of the entire evidence, it becomes unnecessary to pass upon this motion.

The preliminary injunction will therefore be vacated, and the petition dismissed for want of equity; and it is so ordered.